UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JENNIFER OUDERKIRK,

                              Plaintiff,

                                                      3:21-CV-1048 (GTS/ML)
v.

RESCUE MISSION ALLIANCE OF SYRACUSE,
d/b/a Thrifty Shopper,

                              Defendant.
_____

APPEARANCES:                                          OF COUNSEL:

JENNIFER OUDERKIRK
  Plaintiff, *Pro Se*
  83 Van Kirk Road Apt. 1
  Newfield, NY 14867

BOND SCHOENECK & KING, PLLC                           HANNAH K. REDMOND, ESQ.
  Counsel for Defendant                               PATRICK V. MELFI, ESQ.
  One Lincoln Center
  Syracuse, NY 13202

GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

Currently before the Court, in this employment civil rights action filed *pro se* by Jennifer

Ouderkirk ("Plaintiff") against Rescue Mission Alliance of Syracuse, d/b/a Thrifty Shopper

("Defendant"), is Defendant's motion for summary judgment pursuant to Fed. R. Civ. P. 56(c).

(Dkt. No. 52.)  For the reasons stated below, Defendant's motion is granted, and Plaintiff's

Complaint is dismissed.

I.      RELEVANT BACKGROUND

        A.      Plaintiff's Complaint and Relevant Procedural Background

Plaintiff filed this Complaint against Defendant and three of its managers on September 22, 2021.  (Dkt. No. 1 [Plf.'s Complaint].)  Generally, liberally construed, Plaintiff's Complaint asserts the following nine claims: (1) a claim of disability discrimination in violation of the Americans with Disabilities Act ("ADA"); (2) a claim of retaliation in violation of the ADA; (3) a claim of discrimination in violation of the Fourth and Fifth Amendments of the U.S. Constitution and 42 U.S.C. § 1983; (4) a claim of retaliation in violation of the Fourth and Fifth Amendments of the U.S. Constitution and 42 U.S.C. § 1983; (5) a claim of discrimination based on race in violation of Title VII, 42 U.S.C. § 2000e *et seq.*; (6) a claim of discrimination based on religion in violation of Title VII; (7) a claim of discrimination based on gender in violation of Title VII; (8) a claim of a hostile work environment under Title VII; and (9) a claim of retaliation in violation of Title VII.  (*Id.*)[1]

On October 26, 2021, Magistrate Judge Miroslav Lovric issued an Order and Report-Recommendation, which recommended that Plaintiff's claims under the ADA and Fourth and Fifth Amendments be *sua sponte* dismissed without prejudice (and that Defendant's three managers be terminated as parties).  (*See generally* Dkt. No. 4 [Report-Recommendation].)  The Court accepted and adopted in the entirety Magistrate Judge Lovric's Report-Recommendation. (Dkt. No. 5.)  Furthermore, the Court *sua sponte* dismissed without prejudice Plaintiff's race-

---

[1]     The Court notes that, although all pleadings must be construed liberally, the Court has a duty to "extra-liberally" construe a *pro se* plaintiff's complaint.  *Son v. US Army*, 22-cv-1388, 2023 WL 4865532, at *4 (N.D.N.Y. July 31, 2023); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is to be liberally construed, a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.") (internal quotations omitted).

discrimination claim pursuant to Title VII.  (*Id.*)  Thus, only Plaintiff's sixth, seventh, eighth, and ninth claims remain for disposition.

Familiarity with the above-discussed claims and the factual allegations supporting them in Plaintiff's Complaint, and the relevant procedural history, is assumed in this Decision and Order, which is intended primarily for review by the parties.

### B.      Undisputed Material Facts

The Court has carefully considered Defendant's Statement of Material Facts, Plaintiff's Response thereto, and Plaintiff's Statement of Additional Material Facts in Dispute.  Unless otherwise noted, the following material facts were asserted and supported by accurate citations by Defendant in its Statement of Material Facts and expressly admitted by Plaintiff, or denied without a supporting accurate record citation, in her Response thereto.  (*Compare* Dkt. No. 52, Attach. 6 [Def.'s Statement of Material Facts] *with* Dkt. No. 57, Attach. 2 [Plf.'s Response and Statement of Additional Material Facts in Dispute].)

1.       In July 2020, Plaintiff was hired as a Sales Associate I at the Ithaca Thrifty Shopper, and she reported for her first day of work on July 20, 2020.

2.       On July 27, 2020, Plaintiff and Jessica Arnold, the store manager, met for a one-on-one meeting.[2]  Ms. Arnold later prepared what Defendant calls a "Human Resources Key

---

[2]       Plaintiff denies the above-stated fact, but she fails to support that denial through a citation to admissible record evidence that actually controverts the asserted fact.  Specifically, she cites to one paragraph of her declaration and three pages of her deposition transcript.  Her reliance on her declaration is improper, because it post-dates, and thus may not contradict, her previously taken, uncorrected deposition testimony.  (Dkt. No. 52, Attach. 5, at 295 [attaching blank corrections page].)  *See Hayes v. New York City Dept. of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("[A]n affidavit . . . that, by omission or addition, contradicts the affiant's previous deposition testimony" is insufficient to create a genuine issue of fact.); *Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 572 (2d Cir. 1991) ("The rule is well-settled in this circuit that a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony."); *Mack v. U.S.*, 814

3

Event," which purported to memorialize the conversation she had with Plaintiff during that meeting.[3]  Plaintiff did not become aware of the existence of the Human Resources Key Event form until after she was terminated.

3.      On or about August 27, 2020, approximately one month after Plaintiff was hired, one of Plaintiff's coworkers, Trinity Monahan, a Sales Associate II, approached Ms. Arnold to raise a concern that Plaintiff was taking items from the Thrifty Shopper without purchasing them.

4.      Ms. Monahan informed Ms. Arnold that during their closing shift on August 26, 2020, Ms. Monahan cashed Plaintiff out for sheets, which cost $2.24 after the employee discount was applied, and some work clothing, which was free.  Ms. Monahan reported that when Plaintiff left work for the night, however, she was carrying a second bag full of merchandise.[4]

---

F.2d 120, 124 (2d Cir. 1987) ("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment."); *Miller v. Int'l Tel. & Tel. Corp.*, 755 F.2d 20, 24 (2d Cir. 1985) ("This sworn admission . . . could not later be contradicted for the purpose of creating an issue of fact . . . ."). Specifically, during her deposition, Plaintiff admitted to having had a one-on-one meeting with Ms. Arnold on July 27, 2020: she further testified that the meeting occurred "[i]n the back office," lasted maybe about "[f]ive minutes" and was "maybe . . . when she actually gave me the Employee Handbook and the work rules."  (Dkt. No. 52, Attach. 5, at 98-100 [attaching pages "96" through "98" of Plf.'s Depo. Tr. of 9/27/2022].)  Furthermore, her other reliance on her deposition is misplaced, because one page is wholly off-topic, and the other two pages actually contradict her denial.  (*See, e.g.,* Dkt. No. 57, at ¶ 2 [citing page 73 of Plf.'s depo. transcript, in which Plaintiff denies attending a one-on-one meeting with Arnold "when [Plaintiff] first came to the store," *not* on July 27, as well as pages 96 through 98 of her deposition transcript].)

[3]      (Dkt. No. 52, Attach. 4, at 15 [Human Resources Key Event Form].)

[4]      Plaintiff disputes the above-stated fact to the extent that it asserts that "the Plaintiff's free clothes were used as a basis to launch an unwarranted theft investigation, subsequently resulting in her termination."  (Dkt. No. 57, at ¶ 4.)  However, the above-stated fact contains no such express assertion.  *See* N.D.N.Y. L.R. 56.1(a)(3) ("The non-movant's responses shall . . . admit[] and/or deny[] each of the movant's *assertions* in matching numbered paragraphs.") (emphasis added); *Yetman v. Capital Dis. Trans. Auth.*, 12-CV-1670, 2015 WL 4508362, at *10 (N.D.N.Y. July 23, 2015) (citing authority for the point of law that the summary judgment procedure involves the disputation of asserted facts, not the disputation of implied facts).  Furthermore, the

5.      Because Ms. Monahan had not rung Plaintiff out for any additional purchased or free items (which Ms. Monahan believed to be required), and because employees are not permitted to ring themselves out, Ms. Monahan became concerned that Plaintiff had left with stolen product and reported her concerns to Ms. Arnold.[5]

6.      Ms. Arnold, in turn, elevated Ms. Monahan's concerns to the district manager, Tammy Larry.

7.      Consistent with Defendant's typical practice for addressing reports of suspected theft, Ms. Monahan's concerns prompted an investigation intended to determine whether Plaintiff had engaged in theft of Defendant's property.[6]

---

record evidence cited by Plaintiff in support of her (partial) denial does not actually controvert the above-stated fact.  Thus, the Court deems the above-stated fact admitted.

[5]      After admitting that "Monahan made these statements to Arnold," Plaintiff denies that the statements "were made in good faith" and that employees are required to be rung out for "free work clothing."  (Dkt. No. 57, at ¶ 5.)  However, as modified, the above-stated fact never expressly asserts that the statements were made in good faith or that employees are required to be rung out for "free work clothing."  *See, supra,* note 4 of this Decision and Order (citing authorities).  Rather, the above-stated fact merely states what Monahan became concerned of and what the subjective reasons for that concern were (whether correct or incorrect).  As a result, the Court deems the above-stated fact admitted.

[6]      Plaintiff denies that Defendant acted in a manner consistent with its standard practice of addressing reports of suspected theft, but fails to cite record evidence that actually controverts that fact.  (Dkt. No. 57, at ¶ 7.)  Indeed, some of the record evidence she cites actually supports the fact in question (that a prompt investigation is the typical method of addressing a report of suspected theft).  (*See, e.g.,* Dkt. No. 57, Attach. 1, at ¶ 70 [referencing "pending . . . investigation[s]".)  To the extent that Plaintiff asserts that HR was not "involved" *before* the investigation was initiated, Defendant never expressly swore that such involvement regularly *precedes* the investigation, only that it regularly *accompanies* an investigation.  (*See* Dkt. No. 57, Attach. 3, at 28 ["When a complaint or concern regarding suspected theft is received, Human Resources becomes involved and an investigation is promptly conducted."].)  Moreover, here, the evidence establishes that Dali Guantes of HR had been notified of the investigation at least by 5:30 p.m. the next day (August 28), when the investigation was still ongoing.  (Dkt. No. 57, Attach. 3, at 76 [stating that "[w]e are going to gather more info"]; *cf.* Dkt. No. 57, Attach. 1, at ¶ 73 [speaking of a lack of knowledge by Dali Guantes in HR of the events of August 31, not of

8.      As part of the investigation, Ms. Larry, and Thrifty Shopper Sales Manager Brent

Piech, watched surveillance videos from Plaintiff's shifts on August 24 and 26, 2020, and they

compared that surveillance video to Defendant's receipts from those days.[7]  From this

comparison, it appeared to Ms. Larry and Mr. Piech that Plaintiff had taken items from the store

without purchasing them on both dates.[8]

9.      As perceived by Ms. Larry and Mr. Piech, video footage from August 24 and 26,

2020, depicted Plaintiff placing numerous items behind the checkout counter and packing them

into bags that she ultimately left with at the end of her shift; furthermore, while receipts and

surveillance footage show Plaintiff making a few purchases, the number of items she placed in

her bag and left the store with exceeded the items that were paid for.[9]

---

events before then].)  Finally, Plaintiff fails to expressly deny the remainder of the above-stated
fact.  As a result, the Court deems the asserted fact admitted.

[7]      Plaintiff denies the above-stated fact, but fails to cite record evidence that actually
controverts that fact.  (Dkt. No. 57, at ¶ 8.)  Rather, she improperly attempts to dispute a
perceived implication of the above-stated fact (i.e., that the investigation was adequate, unbiased
and/or in good faith).  *See, supra,* note 5 of this Decision and Order (citing authorities).  The
above-stated fact contains no such factual assertion.

[8]      Again, Plaintiff denies the above-stated fact without citing record evidence that actually
controverts that fact.  (Dkt. No. 57, at ¶ 9.)  Indeed, at her deposition, Plaintiff conceded that,
based on the surveillance video, it would have been "reasonable" for a person who was not
accustomed to the culture at the Thrifty Shopper to be concerned that certain items were not paid
for.  (Dkt. No. 52, Attach. 5, at 206-07 [attaching pages "204" and "205" of Plf.'s Depo. Tr.].)

[9]      Again, Plaintiff denies the above-stated facts, but fails to cite record evidence that
actually controverts those facts.  (Dkt. No. 57, at ¶ 9.)  The crux of her denial is that, because
Defendant "edited" the 13 hours of surveillance video (to remove various portions of the
footage), Defendant "altered" that video in a "significant" way.  (*Id*.)  Plaintiff cites no
admissible record evidence supporting an assertion that the video does not fairly and accurately
depict the events it purports to depict.  (*Id*.)  Moreover, Plaintiff's chain-of-custody argument is
unpersuasive given that it is she, and not Defendant, who submitted the video with regard to the
above-stated fact.  Rather, Defendant relies on the sworn statements of Ms. Larry and Mr. Piech.
(Dkt. No. 52, Attach. 6, at ¶ 9.)  In any event, the Court has modified Defendant's originally
asserted fact so that it more accurately reflects the pieces of record evidence cited (which again
are the sworn statement of Ms. Larry and Mr. Piech regarding their perceptions of the video).

10.     Believing that Plaintiff had stolen store items on August 24 and 26, Mr. Piech launched a broader investigation, which entailed watching dozens of hours of surveillance video footage from the dates that Plaintiff had worked in the Ithaca store, to ascertain the extent of Plaintiff's theft.[10]

11.     After reviewing the additional surveillance footage, Mr. Piech believed that Plaintiff's theft had been more extensive than initially anticipated, and he believed that it had occurred across numerous shifts and involved the misappropriation of hundreds of dollars' worth of merchandise.[11]

12.     On August 31, Mr. Piech went to the Ithaca Thrifty Shopper to approach Plaintiff about her theft.[12]

13.     By that time, either Mr. Piech or Ms. Arnold had reported Plaintiff's purported theft to the Ithaca Police Department and arranged for Officer James Balyszak to be present at the store on August 31; however, Plaintiff left the store after a "very brief" interaction with Ms. Arnold and Officer Balyszak.[13]

---

[10]     The Court has modified Defendant's originally asserted fact in order to more accurately reflect the record.  (Dkt. No. 52, Attach. 6, at ¶ 10.)  Plaintiff does not cite any admissible record evidence that controverts any aspect of the modified above-stated fact.  (Dkt. No. 57, at ¶ 10.)

[11]     Although Plaintiff denies the above-stated fact, she fails to cite admissible record evidence that actually controverts the above-stated fact.  (Dkt. No. 57, at ¶ 11.)

[12]     Although Plaintiff denies the above-stated fact, she fails to cite admissible record evidence that actually controverts the above-stated fact.  (Dkt. No. 57, at ¶ 12.)

[13]     Plaintiff denies the above-stated fact.  (Dkt. No. 57, at ¶ 13.)  Specifically, she asserts that Ms. Arnold, not Mr. Piech, called the Ithaca Police Department.  (*Id.*)  In any event, it is undisputed that the Ithaca Police Department was called about Plaintiff's alleged theft, that Officer Balyszak was present at the store on August 31, and that Plaintiff left the store after a "very brief" interaction with Ms. Arnold and Officer Balyszak.  (*See, e.g.,* Dkt. No. 52, Attach. 5, at 171-174 [attaching pages "169" through "172" of Plf.'s Depo. Tr.].)

14. After his investigation, Mr. Piech reached a conclusion that Plaintiff had taken items from the Ithaca Thrifty Shopper without paying for them.[14]

15. As a result of Mr. Piech's conclusion, Mr. Piech and Belinda Teller, the Chief Human Resources Officer for Defendant, made the decision to terminate Plaintiff's employment.[15]

16. By letter dated September 15, Ms. Teller informed Plaintiff that she was terminated effective September 11 "as a result of gross misconduct defined as [her] theft of Rescue Mission property."[16]

17. Plaintiff's last day of work was August 31, 2020.

18. Defendant pressed charges against Plaintiff and provided the Tompkins County District Attorney's Office with more than 13 hours of surveillance footage from the Ithaca Thrifty Shopper; although the District Attorney's Office ultimately declined to prosecute the

---

[14] Although Plaintiff denies the above-stated fact, she fails to cite admissible record evidence that actually controverts the above-stated fact. (Dkt. No. 57, at ¶ 14.)  The Court notes that the above-stated fact speaks only of Mr. Piech's reaching of a conclusion; it says nothing about either the accuracy of that conclusion or the adequacy of the investigation on which it was based.

[15] Plaintiff denies the above-stated fact, asserting that the decision to terminate was made by Mr. Piech and Ms. Larry (not Mr. Piech and Ms. Teller) on August 28. (Dkt. No. 57, at ¶ 15.) However, the August 28 email on which Plaintiff relies does not support her assertion. (Dkt. No. 57, Attach. 3, at 76.)  As an initial matter, fairly and reasonably construed, the email speaks only of what was *expected* to happen on August 31 after Mr. Piech addressed Plaintiff at the beginning of her shift (which never happened because, as Plaintiff concedes, she left the store). (*Id*.)  In any event, the email was sent to Ms. Teller (establishing her involvement in any decision to terminate at that time). (*Id*.)  The Court notes that the above-stated fact does not state on what date the decision was made (only that it was made based on Mr. Piech's post-investigation conclusion).

[16] (Dkt. No. 52, Attach 1, at 5 [Ex. A to Decl. of Teller, Ex. A]; Dkt. No. 57, at ¶ 16 [failing to expressly dispute the above-stated fact and support any such dispute with a citation to admissible record evidence that controverts the above-stated fact].)

case, Plaintiff was initially offered a plea deal which, if accepted, would have required her to enter a guilty plea and pay restitution to Defendant.[17]

19.     Plaintiff never complained to any member of Defendant's management about discrimination, nor did she raise a concern that she was being treated differently than other employees because of her gender or religion.[18]

20.     Other than tell Ms. Arnold that "I go to church on Sundays and I come right to work from church to here, and it would be more accommodating to me to wear a skirt on Sundays [rather than the black pants that were required]" (after which Ms. Arnold granted Plaintiff's request for Sundays off), Plaintiff did not discuss her religion with any of Defendant's employees.[19]

### C.     Parties' Briefing on Defendant's Motion for Summary Judgment

#### 1.     Defendant's Memorandum of Law

---

[17]     (Dkt. No. 52, Attach. 2, at ¶¶ 15-16 [Piech Decl.]; Dkt. No. 57, Attach. 3, at Ex. 39 [Plf.'s Arraignment].)  Although Defendant denies various portions (or implications) of the above-stated facts, she fails to cite admissible record evidence that actually controverts the above-stated facts.  (Dkt. No. 57, at ¶ 18.)

[18]     Plaintiff denies the above-stated fact based on her assertion that she "made three (3) good faith complaints to management and/or Human Resources regarding what she believed were unlawful employment practices." (Dkt. No. 57, at ¶ 19.)  However, setting aside that the above-stated fact says nothing of "unlawful employment practices," the evidence on which Plaintiff attempts to rely (her declaration) post-dates, and thus may not contradict, her previously taken, uncorrected deposition testimony, during which she responded "No" to the question, "Did you ever go to anyone in management and complain that you felt discriminated against?"  (Dkt. No. 52, Attach. 5, at 168-69 [attaching pages "166" and "167" of Plf.'s Depo. Tr.].)  *See, supra,* note 3 of this Decision and Order (citing cases).

[19]     (Dkt. No. 52, Attach. 5, at 121-124 [attaching pages "119" through "122" of Plf.'s Depo. Tr.]; Dkt. No. 52, Attach. 1, at ¶ 15 [Teller Decl.]; Dkt. No. 52, Attach. 2, at ¶ 17 [Piech Decl.]; Dkt. No. 52, Attach. 3, at ¶ 9 [Larry Decl.]; Dkt. No. 52, Attach. 4, at ¶ 5 [Arnold Decl.].)  Plaintiff neither denies the above-stated fact nor cites any admissible record evidence controverting it.  (Dkt. No. 57, at ¶ 20.)

Generally, in its motion for summary judgment, Defendant asserts five arguments.  (Dkt. No. 52, Attach 7 [Def.'s Mem. of Law].)

First, Defendant argues that Plaintiff cannot establish a *prima facie* claim of religious or gender discrimination under Title VII.  (*Id.* at 14-18.)  Regarding Plaintiff's claim of religious discrimination, Defendant argues that this claim must be dismissed for each of two alternative reasons: (1) she offers only "vague and speculative assertions" to support her allegation that she was discriminated against based on her religion because Defendant's Store Manager, Jessica Arnold, did not allow Plaintiff to wear long skirts on Sundays; and (2) even if she did request that she be allowed to wear long skirts on Sundays, she never discussed her religion in any other way with any other employees (and no member of Defendant's management team knew of Plaintiff's religion).  (*Id.* at 14-16.)  Regarding Plaintiff's claim of gender discrimination, Defendant argues that this claim must be dismissed for each of three alternative reasons: (1) there is a strong inference of no discrimination because her termination (which was the only adverse action experienced by Plaintiff during her employment) occurred approximately fifty-three days after her hiring (i.e., July 20 to September 11); (2) there is no admissible record evidence from which a rational juror could find that Plaintiff was terminated based on her gender (e.g., she points to no male comparator who was treated preferentially, and she produces no competent evidence that Defendant acted with gender bias or animus at any time); and (3) there is no gender discrimination, given that Defendant's Chief Human Resources Officer, Belinda Teller, one of the primary decision makers in Plaintiff's termination, is female (and indeed courts regularly acknowledge an inference against discrimination under such a scenario).  (*Id.* at 16-18.)

Second, Defendant argues that Plaintiff has not established a *prima facie* claim of a hostile work environment for two reasons.  (*Id.* at 18-23.)  First, Defendant argues, Plaintiff

cannot demonstrate that Ms. Arnold subjected her to a hostile work environment, because (a) the July 27, 2020 "Human Resources Key Event" form's description of Plaintiff's work attire does not "sexualize[]" her appearance and instead serves to memorialize the fact that she failed to meet Defendant's gender-neutral, uniformly enforced dress code, (b) expecting compliance with a dress code is not evidence of a hostile work environment, (c) her terms and conditions of employment were not altered while she was employed because she did not become aware of the "Human Resources Key Event" form until after her termination, (d) her terms and conditions of employment were not altered while she was employed because the picture that Ms. Arnold posted on social media, which depicted a penis drawn on an item donated to the Ithaca Thrifty Shopper, was posted *after* Plaintiff's termination, (e) Plaintiff cannot recall the sexual comments that Ms. Arnold allegedly made to her on two occasions, (f) there is no admissible record evidence from which a rational juror could find that any of Ms. Arnold's behavior (assuming the truth of Plaintiff's factual assertions) occurred because of Plaintiff's gender, and (g) Plaintiff stated at deposition that Ms. Arnold did not dislike her because she was female, but rather disliked her because Ms. Arnold "hated any woman who was pretty." (*Id.*) Second, Defendant argues, Plaintiff cannot demonstrate that Defendant's Sales Associate II, Trinity Monahan, subjected her to a hostile work environment, because (a) Plaintiff can only speculate that Ms. Monahan's mockery of her voice and mannerisms was motivated by gender animosity, (b) she stated at deposition that Ms. Monahan did not dislike her because of her gender, but rather because Ms. Monahan was "jealous" that she was a "high achiever" and was liked by customers, (c) she never reported Ms. Monahan's mistreatment to Defendant, meaning that, even if Ms. Monahan's behavior constituted a hostile work environment, it cannot be attributed to Defendant, which was unaware of the harassment. (*Id.*)

11

Third, Defendant argues that Plaintiff cannot establish a *prima facie* claim of retaliation for two reasons. (*Id.* at 23-27.) First, Defendant argues, Plaintiff did not engage in a protected activity, because she admitted during her deposition that she never complained about discrimination to Defendant's management (and the other harassment of which she complained either did not constitute protected activity under Title VII or was never successfully communicated to Defendant's management). (*Id.*) Second, Defendant argues, even if Defendant's former Human Resources Business Partner, Ms. Dali Guante, had received Plaintiff's voicemail communication of an unspecified date, Ms. Guante was not involved in the decision to terminate Plaintiff's employment. (*Id.*)

Fourth, in any event, Defendant argues that Plaintiff's claims must be dismissed because, even if Plaintiff had carried her initial burden of stating a prima facie claim of discrimination or retaliation, based on the current record, it is undisputed that she was terminated for legitimate, non-discriminatory and non-retaliatory reasons. (*Id.* at 27-31.) More specifically, Defendant argues that (a) is well settled that theft is a legitimate reason to terminate an employee, and (b) here, after receiving receipts and dozens of hours of surveillance videos of Plaintiff's shifts at the Ithaca Thrifty Shopper on August 24 and 26, Defendant's Sales Manager Mr. Brent Piech reached the conclusion that Plaintiff had stolen items from the Ithaca Thrifty Shopper. (*Id.*)

Fifth, and finally, Defendant argues that it is entitled to judgment as a matter of law on Plaintiff's claims, because she cannot demonstrate that the termination for theft was a pretext for gender and/or religious discrimination. (*Id.* at 28-31.) Defendant argues, as a threshold matter, that although she denies committing theft, Plaintiff actually committed theft, given that there is surveillance footage depicting the theft, and she cannot produce receipts for many of the items she took on the surveillance footage. (*Id.*) Moreover, even if the theft did not occur, Plaintiff's

claims must be dismissed because Defendant had a good faith basis to believe that Plaintiff

engaged in theft, and Defendant's actions were not motivated by any discriminatory or

retaliatory animus.  (*Id.*)

### 2. Plaintiff's Opposition Memorandum of Law

Generally, in her opposition memorandum of law, Plaintiff asserts six arguments.  (Dkt.

No. 61 [Plf.'s Opp'n Memo. of Law].)

First, Plaintiff argues that the "Human Resources Key Event" form is evidence of

discrimination because it "slut-sham[ed] her and indicat[ed] to the reader that she [Plaintiff] was

a whore who insolently wore sexually provocative clothing . . . to her job on her second day of

work" when it stated that she had worn "mini tight skirts, and open toed high-heel shoes."  (*Id.* at

5-7.)

Second, Plaintiff argues that Defendant's "biased investigation" is evident from the

following three facts: (a) the fact that, before deciding to terminate Plaintiff's employment, Ms.

Larry and Mr. Piech failed to "interview several important witnesses[,]" and were "influenced by

Ms. Arnold's discriminatory animus"; (b) the fact that Ms. Arnold, Ms. Larry, Mr. Piech, and an

unidentified employee named "Rick" "create[ed] highly suspicious, significantly altered, and

edited video clips of incomplete acts of Plaintiff's work performance"; and (c) the fact that

Defendant violated its own policy by commencing an investigation before HR had been notified.

(*Id.* at 8-10.)

Third, Plaintiff argues that the circumstances surrounding Defendant's decision to

terminate her on August 31 give rise to an inference of discrimination.  (*Id.* at 11-12.)  More

specifically, Plaintiff argues that this inference is reasonable because of the following facts: (a)

the fact that Defendant's employees "arranged for Plaintiff to be sizing clothes at the front of the

13

store so that her termination and anticipated arrest would be a public spectacle, with everyone watching, thinking that Plaintiff was a thief and seeing her get fired"; (b) the fact that Defendant decided to terminate Plaintiff's employment instead of giving her the option to resign, as it had given that option to seven of the eight employees previously believed to have engaged in theft (five of whom had been suspended without pay pending an investigation); and (c) the fact that Plaintiff did not "receive notice that she was being investigated for theft[,]" and that Defendant never questioned her "or provided her with an opportunity to defend herself against the theft accusations." (*Id.*)

Fourth, even if the decision to terminate Plaintiff was not made until September 11, evidence exists to support a prima facie case of retaliation because, according to Plaintiff's sworn declaration testimony (and a corroborating email message from September 8), the day before, i.e., on September 10, Plaintiff had informed Ms. Teller that she intended to file a complaint against Defendant with the New York State Division of Human of Rights ("NYSDHR"). (*Id.* at 12-14.)

Fifth, Plaintiff argues that Defendant (motivated by Ms. Arnold's discriminatory animus) subjected her to a hostile work environment through the following actions: (a) Ms. Arnold's sexually harassing performance review of Plaintiff on July 27; (b) Ms. Arnold's permanent removal of Plaintiff's pricing gun on or about August 18 (which altered the terms and conditions of her employment); (c) Ms. Arnold's taking of Plaintiff's carpel tunnel arm brace and making her lift heavy furniture in mid- to late-August; (d) Plaintiff's adverse performance review of August 28 based on numerous fabrications and falsehoods; (e) an employee's attempt to steal a $50 gift certificate directly from Plaintiff's purse; (f) Defendant's excessive scrutiny, and biased investigation, of Plaintiff; (g) Defendant's constant and public accusations that Plaintiff was

stealing free work clothes and paid merchandise; (h) Defendant's creation of sardonic videos of Plaintiff and its falsely accusing her of theft; and (i) Defendant's attempt to terminate (and humiliate) Plaintiff in public on August 31.  (*Id.* at 14-16.)

Sixth, and finally, Plaintiff argues that, at the very least, she has established a prima facie case of retaliation against Defendant by (a) adducing evidence of the several attempts she made in good faith to complain of her harassment by Defendant, including informing Ms. Teller of her intended complaint on September 10, and (b) adducing evidence of the numerous forms of adverse employment actions she experienced (including those listed in the previous paragraph) (*Id*. at 16-17.)

### 3.     Defendant's Reply Memorandum of Law

Generally, in its reply memorandum of law, Defendant makes four arguments.  (Dkt. No. 70 [Def.'s Reply Memo. of Law].)  First, Defendant argues that Plaintiff was terminated for legitimate, non-discriminatory reasons, specifically because of her theft of Defendant's property. (*Id.* at 4-6.)  Furthermore, Defendant argues, even assuming that Plaintiff did not engage in theft, Plaintiff cannot demonstrate pretext, because there was a good-faith basis for Defendant to believe that she engaged in theft.  (*Id.*)  More specifically, Defendant argues that this good-faith basis is grounded in the video surveillance footage of Plaintiff, and her own admission in her deposition that her receipts were not reflective of the items she handled in the surveillance footage.  (*Id.*)

Second, Defendant argues that her religious and gender discrimination claims must be dismissed.  (*Id*. at 6-9.)  Regarding Plaintiff's religious discrimination claim, Defendant incorporates its previous arguments into its reply memorandum of law, which are summarized in Part I.C.1 of this Decision and Order.  (*Id.* at 6.)  Regarding Plaintiff's gender discrimination

claim, Defendant argues that Plaintiff's assertions that surveillance footage was "manipulated," and that standard investigative procedures were not followed, are unfounded; and she fails to articulate how Defendant's investigation discriminated against her on the basis of gender or sex. (*Id.*) Furthermore, Defendant argues, the fact that Plaintiff was terminated and did not resign is not an inference of discrimination. (*Id.* at 8.) Defendant argues that employees who resigned in lieu of termination for theft usually took responsibility for their actions and apologized; in contrast, Defendant argues, Plaintiff showed no remorse throughout the whole process. (*Id.*) Moreover, Defendant argues, it has involuntarily terminated both males and females for theft, which refutes Plaintiff's claim of gender discrimination. (*Id.*)

Third, Defendant argues that Plaintiff's hostile work environment claim must be dismissed for several reasons. (*Id.* at 6.) As a threshold matter, Defendant argues, the July 27, 2020, Human Resources Key Note Event form, which forms the crux of Plaintiff's claim, does not "slut sham[e]" Plaintiff because it describes her attire in a gender neutral fashion and indicates she was not compliant with Defendant's "Personal Appearance Policy." (*Id.* at 10.) Moreover, Defendant argues that the July 27, 2020, form could not have altered the terms and conditions of Plaintiff's employment because she did not become aware of the form until after the termination of her employment. (*Id.*) Lastly, Defendant argues that none of the other allegations that Plaintiff makes to support her hostile work environment claim (*see, supra,* Part I.C.2 of this Decision and Order) are "sufficiently severe and pervasive to constitute harassment." (*Id.* at 11.)

Fourth, and finally, Defendant argues that Plaintiff's retaliation claim must be dismissed because she did not engage in any protected activity during her employment, given that any complaints that she made during her tenure were not about discrimination. (*Id.*, at 11.)

Furthermore, Defendant argues that Plaintiff's "recently" found notes in her employment files

cannot save her retaliation claim.  (*Id.* at 12-13.)  Defendant argues that the notes (which Plaintiff

includes in her opposition papers, *see* Dkt. No. 57, Attach. 3, at 191-192) do not indicate that she

successfully expressed to Teller her intent to file a NYSDHR complaint against Defendant on

September 10.  (Dkt. No. 70, at 13.)  Moreover, Defendant argues that, even if the evidence did

show that Plaintiff successfully informed Teller of her intent to file a complaint on September

10, "temporal proximity" between the protected activity and retaliation, on its own, is

insufficient to survive summary judgment as a matter of law.  (*Id.*)

## II.    RELEVANT LEGAL STANDARDS

### A.    Standard Governing a Motion for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that

there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as

a matter of law." Fed. R. Civ. P. 56(a).  A dispute of fact is "genuine" if "the [record] evidence is

such that a reasonable jury could return a verdict for the [non-movant]."  *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 248 (1986).[20]  As for the materiality requirement, a dispute of fact is

"material" if it "might affect the outcome of the suit under the governing law . . . .  Factual

disputes that are irrelevant or unnecessary will not be counted."  *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all

ambiguities and draw all reasonable inferences against the movant.  *Anderson*, 477 U.S. at 255.

In addition, "[the movant] bears the initial responsibility of informing the district court of the

---

[20]       As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to
create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d, 400 (2d Cir. 1998) [citation
omitted]. As the Supreme Court has explained, "[The non-movant] must do more than simply
show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.,
Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).  However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial.  Fed. R. Civ. P. 56(a), (c), (e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.[21]  Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).  Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant.  *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F.Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 56.1(b).[22]  What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1 by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported

---

[21]     *Cusamano v. Sobek*, 604 F.Supp.2d 416, 426 & n.2 (N.D.N.Y. 2009) (Suddaby, J.) (citing cases).

[22]     Local Rule 56.1 was formerly known as L.R. 7.1(a)(3) before the Local Rules were amended January 1, 2021.

by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement.[23]

### B.    Standard Governing Claims Under Title VII

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of," *inter alia*, "such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a)(1). Liability under Title VII is limited to employers, not individuals.  *See Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir. 2012).

Filing a charge with the Equal Employment Opportunity Commission ("EEOC") is a jurisdictional prerequisite to a private civil action under Title VII.  *See Morgan v. NYS Attorney Gen.'s Office*, 11-cv-9389, 2013 WL 491525, at *6 (S.D.N.Y. Feb. 8, 2013) (citing *Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 146 (2d Cir. 2012) (citing 42 U.S.C. §§ 2000e–5(e) (1), (f)(1))).  Claims not raised before the EEOC may still be brought in federal court as long as they are "reasonably related" to the claims that were filed with the agency.  *See id*. (quoting *Butts v. N.Y.C. Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1401 (2d Cir. 1993), superseded by statute on other grounds as recognized in *Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684 (2d Cir. 1998)).  A claim is "reasonably related" where the conduct complained of "would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Butts*, 990 F.2d at 1402.

### 1.    Claim of Discrimination

---

[23]    Among other things, Local Rule 56.1(a) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.  N.D.N.Y. L. R. 56.1(a).

At the summary judgment stage, properly exhausted Title VII claims are ordinarily analyzed under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny. *See Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506-07 (1993); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)). At the first stage of the *McDonnell Douglas* analysis, the plaintiff bears the burden to show that, in general, "(1) [she] is a member of a protected class; (2) [she] was qualified for the position he held; (3) [she] suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination." *Bir v. Pfizer, Inc.*, 510 F. App'x 29, 30 (2d Cir. 2013) (quoting *Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir. 2012) (internal quotation marks and alteration omitted)). "A showing of disparate treatment – that is, a showing that the employer treated plaintiff less favorably than a similarly situated employee outside his protected group – is a recognized method of raising an inference of discrimination for purposes of making out a prima facie case." *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003).

Once a plaintiff establishes a prima facie case, the burden shifts to the employer to provide a legitimate non-discriminatory reason for the employment action at issue. *See Bir*, 2013 WL 362973, at *1 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)). If the employer makes this showing, the burden then shifts back to the plaintiff to show that the employer's proffered explanation is a pretext for discrimination. *Id.* (citing *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 492 (2d Cir. 2010)).

"'A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment. To be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job

responsibilities.'  A change that is 'materially adverse' could consist of, *inter alia*, 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices. . . unique to a particular situation.'"  *Morgan*, 2013 WL 491525, at *5 (quoting *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)).

### a.      Based on Religion

More specifically, "To establish a prima facie case of discrimination based on religion under Title VII, the plaintiff must show that she (1) was a member of a protected class, (2) was qualified for her job, (3) suffered a materially adverse employment action, (4) under circumstances giving rise to an inference of religious discrimination."  *Rightnour v. Tiffany & Co.*, 354 F. Supp. 3d 511, 522 (S.D.N.Y. 2019) (citing *Atkins v. Pitney Bowes Mgmt. Servs.*, 12-cv-5575, 2015 WL 144158, at *4 (S.D.N.Y. Jan. 12, 2015).  "Once a prima facie case is established by the employee, the employer 'must offer him or her a reasonable accommodation, unless doing so would cause the employer to suffer an undue hardship.'"  *Baker v. The Home Depot*, 445 F.3d 541, 546 (2d Cir. 2006) (citing *Cosme v. Henderson*, 287 F.3d 152, 158 (2d Cir. 2002)).  "An offered accommodation is reasonable where it eliminates the conflict between the employment requirement and the religious practice."  *O'Neill v. City of Bridgeport Police Dep't*, 719 F. Supp. 2d 219, 227 (D. Conn. 2010) (internal quotations omitted).

### b.      Based on Gender

"In order for a plaintiff to establish a prima facie case of gender discrimination, the plaintiff must establish that (1) she was within a protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination*."  Fanelli v. New*

*York*, 51 F. Supp. 3d 219, 230 (E.D.N.Y. 2014) (citing *McDonnell Douglas Corp.*, 411 U.S. 792 (1973)). "With regard to the fourth prong of this test, the Second Circuit has held that an inference of discrimination may be drawn either from (1) direct evidence of discriminatory intent, or (2) a showing by the [p]laintiff that 'she was subject to disparate treatment ... [compared to persons] similarly situated ... [to herself].'" *Id.*, at 230-31 (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)).

## 2.      Claim of Hostile Work Environment

In enacting Title VII, Congress intended to protect against "the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." *Redd v. New York Div. of Parole*, 678 F.3d 166, 174-175 (2d Cir. 2012) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

In order to establish a claim for a hostile work environment under Title VII, the underlying harassment alleged "must be sufficiently severe or pervasive," both subjectively and objectively, "to alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Redd*, 678 F.3d at 175 (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986); *Harris*, 510 U.S. at 21-22). Further, the plaintiff must establish that the hostile or abusive treatment was because of her membership in a class of persons protected by Title VII. *See Redd*, 678 F.3d at 175.

A determination of whether an environment is objectively hostile or abusive requires an evaluation of all the circumstances, such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Redd*, 678 F.3d at 175 (citing *Harris*, 510 U.S. at 23). Whether an environment is subjectively hostile or abusive

may be determined by the effect on the plaintiff's psychological well-being, although no single

factor is required.  *See id.*

In order to establish his claim for hostile work environment, a plaintiff need not show that

her "working environment was both severe and pervasive; only that it was sufficiently severe or

sufficiently pervasive, or a sufficient combination of these elements, to have altered her working

conditions."  *Redd*, 678 F.3d at 175 (quoting *Pucino v. Verizon Commc'ns, Inc.*, 618 F.3d 112,

119 (2d Cir. 2010)).  Typically, isolated incidents will not suffice to establish a hostile work

environment, "although we have often noted that even a single episode of harassment can

establish a hostile work environment if the incident is sufficiently severe."  *Redd*, 678 F.3d at

175–176 (citing, *inter alia*, *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004) ("[A] single

act can create a hostile work environment if it in fact work[s] a transformation of the plaintiff's

workplace." (internal quotation marks omitted)).

It is important to keep in mind, however, that "while the central statutory purpose of Title

VII was eradicating discrimination in employment, Title VII does not set forth a general civility

code for the American workplace."  *Redd*, 678 F.3d at 176 (quoting *Franks v. Bowman Transp.*

*Co.*, 424 U.S. 747, 771 (1976); *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53,

68 (2006).  Title VII is "meant to protect individuals from abuse and trauma that is severe[, but

is] not intended to promote or enforce civility, gentility or even decency."  *Taylor v. New York*

*City Dept. of Educ* ., 11-cv-3582, 2012 WL 3150388, at *8 (E.D.N.Y. Aug. 2, 2012) (quoting

*Curtis v. DiMaio*, 46 F.Supp. 2d 206, 213-14 (E.D.N.Y. 1999)).  Thus, "the 'mere utterance of an

epithet which engenders offensive feelings' is insufficient to sustain a hostile work environment

claim."  *Tolbert v. Smith*, 09-cv-6579, 2014 WL 906158, at *19 (W.D.N.Y. Mar. 7, 2014)

(quoting *Hannon v. Wilson Greatbatch, Ltd.*, 00-cv-0203, 2002 WL 1012971, *7 (W.D.N.Y.

Apr. 24, 2002). *See also Brown v. Coach Stores, Inc.*, 163 F.3d 706 (2d Cir. 1998) (occasional offensive racial comments are not sufficiently severe or pervasive to establish a hostile work environment).

### 3.     Claim of Retaliation

"To make out a prima facie case of retaliation under Title VII, a plaintiff must show [the following]: (1) participation in a protected activity known to Defendants; (2) an adverse employment action; and (3) a causal connection between the two." *Schanfield v. Sojitz Corp. of Am.*, 663 F.Supp.2d 305, 341 (S.D.N.Y.2009) (collecting cases).

"The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) (noting that a protected activity need not "rise to the level of a formal complaint in order to receive statutory protection"). Protected activities encompass "making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." *Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990).

An adverse employment action is any employer action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006). "[T]ermination is an adverse employment action." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006).

A plaintiff may establish a causal connection between the protected activity and the adverse employment action "either (1) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant[,] or (2) indirectly, by showing that the protected activity was followed closely by discriminatory treatment." *Schanfield*, 663 F.Supp.2d at 343 (citing

*Knight v. City of New York*, 303 F.Supp.2d 485, 496 (S.D.N.Y.2004)).  "Direct evidence giving

rise to an inference of discrimination may include 'a showing that the employer criticized the

plaintiff's performance in ethnically degrading terms, made invidious comments about others in

the employee's protected group, or treated employees not in the protected group more

favorably.'"  *Id*. (quoting *Hunter v. St. Francis Hosp.*, 281 F.Supp.2d 534, 542 (E.D.N.Y. 2003)).

In order for a court to "accept mere temporal proximity between an employer's

knowledge of protected activity and an adverse employment action as sufficient evidence of

causality to establish a prima facie case," the temporal proximity must be "very close."  *Clark*

*Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (citing cases finding temporal proximity of

three months and more to be insufficient).  However, at the pretext stage, "Temporal proximity

alone is insufficient to defeat summary judgment . . . ."  *Zann Kwan v. Andalex Grp. LLC*, 737

F.3d 834, 847 (2d Cir. 2013).  To use temporal proximity at the pretext stage, "a plaintiff may

rely on evidence comprising her prima facie case, including temporal proximity, together with

other evidence such as inconsistent employer explanations, to defeat summary judgment at that

stage."  *Id.  See also Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 770 (2d Cir. 1998)

(holding that a strong temporal connection between the plaintiff's protected activity and other

circumstantial evidence is sufficient to survive summary judgment with respect to pretext),

abrogated in part on other grounds by *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101

(2002).

Claims of retaliation under Title VII are governed by the burden-shifting analysis

announced in *McDonnell Douglas*, 411 U.S. at 802.  *See Guzman v. News Corp.*, 09-cv-9323,

2013 WL 5807058, at * 19 (S.D.N.Y. Oct. 28, 2013) (citing *Fincher v. Depository Trust &*

*Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010); *Lennert–Gonzalez v. Delta Airlines, Inc.*, 11-

cv-1459, 2013 WL 754710, at *9 (S.D.N.Y. Feb. 28, 2013)).  *See also Puglisi v. Town of Hempstead*, 545 F. App'x 23, ——, 2013 WL 5663223 (2d Cir. Oct. 18, 2013) (discussing Title VII retaliation claim in context of McDonnell–Douglas burden-shifting framework).  "Under *McDonnell Douglas*, once the plaintiff has established a prima facie case of retaliation, the burden of production shifts to the defendant to proffer a legitimate, nondiscriminatory business rationale to justify its adverse employment action."  *Schanfield*, 663 F.Supp.2d at 343.  "If the employer demonstrates a legitimate, non-discriminatory reason, then the burden shifts back to the plaintiff to show that, 'but for' the protected activity, she would not have been terminated.  *Guzman*, 2013 WL 5807058, at * 19 (citing *Univ. of Tex. Southwestern Med. Ctr. V. Nassar*, 570 U.S. 338, 362 (2013)).

## III.  ANALYSIS

After careful considering the matter, the Court finds that Defendant's motion should be granted for each of the numerous reasons stated in its memoranda of law (including its several alternative reasons).  *See, supra,* Parts I.C.1 and I.C.3 of this Decision and Order.  To those reasons, the Court adds only four brief points (which are intended to supplement and not supplant Defendant's reasons).

First, regarding Plaintiff's religious discrimination claim, the Court observes that the record evidence is clear that, aside from a brief conversation with Arnold – in which Plaintiff inquired whether she could wear skirts to work on Sundays because she went to church before her shift and wore skirts to church – Plaintiff did not have any conversations about her religion with any of Defendant's employees.  *See, supra,* Fact No. 20 in Part I.B. of this Decision and Order.  Indeed, during Plaintiff's deposition, the following exchange took place:

Q.      Did you and Miss Arnold ever discuss your religion?

> A.     No.
>
> Q.     Did you ever discuss your religion with anybody at the Mission?
>
> A.     Other than just saying that I go to church on Sundays, no.

(Dkt. No. 52, Attach. 5, at 124 [attaching page "122" of Plf.'s Depo. Tr.].)  Based on this

exchange, Defendant would not have even known of Plaintiff's religion, and thus could not have

discriminated against her because of it.  *See Sacks v. Gandhi Eng'g, Inc.*, 999 F. Supp. 2d 629,

644 (S.D.N.Y. 2014) (dismissing Title VII claim because the plaintiff "conceded that no one at

the company discussed his religion, and that, in fact, [the plaintiff's] religion was unknown to

[the defendant] during the time [he] was employed."); *Zinnamon v. New York City Civilian*

*Complaint Rev. Bd.,* 08-cv-02155, 2010 WL 3516218, at *6 (E.D.N.Y. Aug. 30, 2010)

(dismissing Title VII claim because the plaintiff admitted that the defendant did not know she

was Protestant).

         In any event, even if Defendant had knowledge of Plaintiff's religion, she testified during

her deposition that she had been granted an accommodation after asking for one: she was not

required to work on Sundays.  (Dkt. No. 52, Attach. 5, at 123-24 [attaching pages "121" and

"122" of Plf.'s Depo. Tr.].)  *See Cosme v. Henderson*, 287 F.3d 152, 158 (2d Cir. 2002)

(affirming district court decision that found that the defendant offered a reasonable religious

accommodation when it allowed a plaintiff to take Saturdays off); *O'Neill v. City of Bridgeport*

*Police Dep't,* 719 F. Supp. 2d 219, 227 (D. Conn. 2010) (dismissing religious discrimination

claim because the defendant offered a reasonable accommodation by allowing the plaintiff to use

vacation days to take the Sabbath off).[24]

---

[24]      The Court notes that Plaintiff offers no admissible record evidence controverting the fact
that Defendant is a "faith-based not-for-profit organization established on Christian principles . .
. ."  (*Compare* Dkt. No. 52, Attach. 1, at ¶ 2 [Teller Decl., stating fact] *with* Dkt. No. 61, at 4

Second, regarding Plaintiff's gender-discrimination claim, the Court observes that the only adverse employment action that Plaintiff suffered was her termination, and the record is devoid of any evidence establishing that Plaintiff was terminated because of her gender. To the contrary, the record contains evidence that she was terminated based on Defendant's "reasonable" belief that she had engaged in theft. For example, at Plaintiff's deposition, although she usually denied stealing Defendant's property, she did concede that video surveillance footage appeared to show her placing items in bags that were not listed on receipts, and she further conceded that it would have been "reasonable" for a person watching the video to be concerned that those items were not paid for. (Dkt. No. 52, Attach. 5, at 206-07 [attaching pages "204" and "205" of Plf.'s Depo. Tr.].) Moreover, at times, Plaintiff did not explicitly deny that she stole items, and instead seemed to justify her conduct by claiming that "everybody did the same thing." (*Id.* at 197.)[25]

Third, regarding Plaintiff's hostile work environment claim, the Court observes that Plaintiff conceded during her deposition that Ms. Arnold's conduct (assuming, *arguendo*, that it actually occurred) was motivated not by Plaintiff's gender, but by the fact that "[Ms. Arnold] just hated any woman who was pretty." (*Id.* at 119-20.) Likewise, Plaintiff testified that Ms. Monahan's conduct (again assuming, *arguendo*, that it actually occurred) was motivated by her personal dislike of Plaintiff; specifically, Plaintiff testified that Monahan was "jealous" of her because she was a "high achiever." (Dkt. No. 52, Attach. 5, at 127 [attaching page "125" of

---

[Plf.'s Opposition Memo. of Law, acknowledging that "Rescue Mission is a non-profit faith-based organization with the same values as hose of the Plaintiff"].)

[25]     Finally, the Court notes that it is not only Defendant's Chief Human Resources Officer, Belinda Teller, who is female; also female is Defendant's District Manager, Tammy Larry (who Plaintiff claims was the other decision maker).

Plf.'s Depo. Tr.].)  As stated above in Part II.B.2. of this Decision and Order, the plaintiff must establish that the hostile or abusive treatment was because of her membership in a class of persons protected by Title VII.  *Redd v. New York Div. of Parole*, 678 F.3d 166, 175 (2d Cir.2012).  Thus, given that Plaintiff testified that Defendant's employees harassed her out of personal dislike (which is not a protected classification under Title VII), her claims fail as a matter of law.  *See Risco v. McHugh,* 868 F. Supp. 2d 75, 112 (S.D.N.Y. 2012*)* ("'[P]ersonality conflicts at work that generate antipathy and snubbing by supervisors and co-workers are not actionable under [Title VII].'") (quoting *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80, (1998)).[26]

Fourth, regarding Plaintiff's retaliation claim, the Court observes that there is no admissible record evidence establishing that, before her termination, Plaintiff engaged in any protected activity, which is necessary to maintain a retaliation claim.  Plaintiff's strongest argument that she engaged in a protected activity regards her late-blossoming declaration testimony that she told Ms. Teller on September 10, 2020, that she planned to file a complaint with NYSDHR (her other arguments failing because the prior harassment of which she complained either did not constitute protected activity under Title VII or was never successfully communicated to Defendant's management).  However, the corroborating notes that she cites in support of this argument (which notes she belatedly, "unexpectedly" found) make no mention of

---

[26]     The Court notes that, because Plaintiff was an at-will employee, Defendant could terminate her employment "at any time, for any reason, or for no reason at all," as long as the reason was not a prohibited one (such as her religion or her gender under Title VII).  *See Gorrill v. Icelandair/Flugleidir*, 761 F.2d 847, 851 (2d Cir. 1985) ("New York has long held that employment for an indefinite term is terminable at the will of either party at any time, for any reason, or for no reason at all . . . – absent a constitutionally impermissible purpose, a statutory proscription, or an express limitation in the individual contract of employment.") (internal quotation marks and citations omitted).

her intent to file a complaint with NYSDHR on September 10 or at any time.  (Dkt. No. 57, Attach. 3, at 192-93 [Plf.'s Ex. 43].)

Under the circumstances, such corroboration is required by *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (recognizing that, when deciding a motion for summary judgment, a district court must render a credibility determination when facing a plaintiff's internally contradictory testimony that is wholly unsupported by corroborating record evidence). The Court accepts Plaintiff's admission during her deposition that she never went to anyone in management to complain that she felt discriminated against.  (Dkt. No. 52, Attach. 5, at 168-69 [attaching pages "166" and "167" of Plf.'s Depo. Tr.].)

In any event, even if Plaintiff had established a prima facie claim of retaliation, as Defendant argues, the admissible record evidence in the current record establishes that Defendant terminated Plaintiff based on its previously formed, evidence-based belief (whether ultimately correct or incorrect) that she had engaged in theft on August 24, and 26, not because she had engaged in any protected activity on September 10 (or at any time).  Given that Defendant has demonstrated "a legitimate, non-discriminatory reason [for Plaintiff's termination,] the burden shifts back to [Plaintiff] to show that, but for the protected activity, she would not have been terminated.  *Guzman*, 2013 WL 5807058, at *19 (internal citation omitted). However, Plaintiff has produced no such "but for" evidence here.

For all of these reasons, including the numerous reasons stated in Defendant's memoranda of law, the Court grants Defendant's motion.

**ACCORDINGLY**, it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 52) is **<u>GRANTED</u>**; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **<u>DISMISSED</u> with prejudice**.

Dated: December 19, 2023
　　　　　Syracuse, NY



Glenn T. Suddaby
U.S. District Judge